UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                                                             :
JOSHUA CACHO,                                                :
                                                             :
                              Plaintiff,                     :
                                                             :            23-cv-11157 (LJL)
              -v-                                            :
                                                             :            OPINION AND ORDER
MCCARTHY & KELLY LLP,                                        :
                                                             :
                              Defendant.                     :
                                                             :
----------------------------------------------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____         │
│ DATE FILED:__7/3/2024__          │
└─────────────────────────────────┘
```

LEWIS J. LIMAN, United States District Judge:

Defendant McCarthy & Kelly LLP ("Defendant") moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), Dkt. No. 13, to dismiss the complaint of pro se Plaintiff Joshua Cacho ("Plaintiff"), Dkt. No. 1 (the "Complaint"), for failure to state a claim. For the following reasons, the motion is granted and the complaint is dismissed without prejudice to repleading within sixty days.

## BACKGROUND

In resolving this motion, the Court accepts the well-pleaded allegations of the Complaint as true and, because Plaintiff is proceeding pro se, the Court construes Plaintiff's filings broadly and liberally so as to raise the strongest arguments they suggest. *See Ahmad v. Experian Info. Sols., Inc.*, 2023 WL 8650192, at *1 (S.D.N.Y. Dec. 14, 2023).

Plaintiff owns a cellphone "for personal, family, and household" purposes. Dkt. No. ¶ 97. As he has not had a landline phone at his residence for the past fifteen years, Plaintiff relies on his cellphone to communicate with friends and family. *Id.* In addition to placing and receiving personal calls, Plaintiff uses his cellphone to text, email, set timers when cooking, and navigate. *Id.* The cellphone is registered in Plaintiff's name and he pays for it from his personal

accounts.  *Id.*  Plaintiff also registered his phone on the National Do No Call Registry prior to May 2023.  *Id.* ¶¶ 38–39.

Despite his Do Not Call registration, Plaintiff received a call on June 1, 2023, at 2:50 P.M. from a man who identified himself as "John" and asked Plaintiff whether he or any of his family members had spent time at Camp Lejeune between 1953 and 1987 and suffered from a disease "like cancer."  *Id.* ¶¶ 47, 57.  Plaintiff informed the caller that he was on the Do No Call Registry and told the caller not to contact him again.  *Id.* ¶ 48.  But Plaintiff's request was to no avail.  Between June 1 and July 20, 2023, Plaintiff received at least thirty-three more calls on his cellphone asking whether he or any family member had been to Camp Lejeune between 1953 and 1987 and suffered from a disease such as cancer.  *Id.* ¶¶ 49, 57.  Although Plaintiff invariably told the callers not to contact his cellphone and then hung up, the callers disregarded Plaintiff's instructions and continued to pester him.  *Id.* ¶ 51.

When Plaintiff received yet another call on his cellphone posing the same question on the morning of July 25, 2023, he decided to try a different approach.  *Id.* ¶ 52.  Using the pseudonym "Alex Rivera," Plaintiff told the caller that his deceased father had spent time at Camp Lejeune during the relevant period and then suffered from a disease.  *Id.* ¶ 53; *see also id.* at ECF pp. 26, 28.  The caller eventually transferred Plaintiff's call to William Kelly, a partner at Defendant.  *Id.* ¶ 53.  While they spoke, Mr. Kelly sent Plaintiff a series of emails, *id.* ¶ 54, that provided Mr. Kelly's contact information and stated that Camp Lejeune victims and their families are entitled to substantial financial awards, *id.* at ECF pp. 26–27.

That afternoon, Defendant and an affiliated law firm sent Plaintiff a representation agreement to review and sign.  *Id.* ¶ 55; *see also id.* at ECF p. 28.  The contract stated that Defendant and its affiliated firm would represent Plaintiff with respect to "potential claim(s)

against the United States Government in connection with injuries from exposure to contaminated water at Camp Lejeune, North Carolina." *Id.* at ECF p. 29.  Under the contract, Defendant would receive compensation in the form of a contingency fee—namely, a portion of Plaintiff's recovery on his claim against the United States Government. *See id.*  Yet the contract added that "in the event no recovery is made, I will not owe . . . [Defendant] for any sums whatsoever as attorneys' fees except as specifically provided herein." *Id.* (emphasis omitted).  Specifically, if Defendant recommends that Plaintiff settle, but Plaintiff elects to proceed to trial and the trial does not result in a damages award, then Defendant "will have the right to collect reasonable expenses from me incurred in this litigation." *Id.*

Rather than sign the contract, Plaintiff revealed to Defendant that he was not interested in pursuing a claim. *Id.* ¶ 56.  He also requested a copy of Defendant's do-not-call policy. *Id.* at 60.  But Plaintiff did not receive a copy of that policy. *Id.* ¶ 61.  Instead, Plaintiff received another email from Defendant and its affiliated firm on July 28, 2023 reattaching the representation agreement for Plaintiff to sign. *Id.* at ECF p. 30.

Plaintiff never provided his phone number to Defendant or the callers; nor did he have a preexisting business relationship with Defendant. *Id.* ¶¶ 58–59.  Accordingly, those calls invaded his privacy and left Plaintiff frustrated and angry. *Id.* ¶ 96.  They also reduced the data on his plan as well as the storage and charge on his cellphone. *Id.*

## PROCEDURAL HISTORY

Plaintiff initiated this action by filing the Complaint pro se in the United States District Court for the Western District of Texas on August 15, 2023. *Id.*  The Complaint asserts five claims:  First, Defendant violated the Telephone Consumer Protection Act of 1991 ("TCPA") and the implementing regulations promulgated by the Federal Communications Commission ("FCC") by having telemarketers call his cellphone for the purposes of commercial solicitation,

despite his registration with the National Do Not Call Registry. *Id.* ¶¶ 98–102. Second, Defendant violated TCPA regulations by failing to abide by the FCC's telemarketing program requirements, including the maintenance of a written do-not-call policy, available on demand. *Id.* ¶¶ 103–106. Third, Defendant violated Florida state law by having telemarketers call Plaintiff for telephone solicitation using automated means without Plaintiff's express written consent. *Id.* ¶¶ 107–111. Fourth, Defendant violated another provision of Florida state law by having telemarketers call him more than three times within a twenty-four-hour period. *Id.* ¶¶ 112–115. Finally, Defendant violated Texas state law by having telemarketers contact Plaintiff with solicitation sales calls without the requisite license. *Id.* ¶¶ 116–119. Plaintiff therefore sought declaratory relief, statutory and punitive damages, and attorneys' fees. *Id.* at ECF pp. 22–24.

On December 4, 2023, Defendant filed a motion to dismiss for lack of personal jurisdiction and forum non conveniens. Dkt. No. 6. Approximately two weeks later, Plaintiff filed a motion to transfer venue to the Southern District of New York with Defendant's consent. Dkt. No. 7. Judge Kathleen Cardone of the Western District of Texas granted Plaintiff's motion to transfer and thus denied Defendant's motion to dismiss as moot. Dkt. No. 8. The case was then transferred to this District and assigned to the undersigned. Dkt. No. 9.

Defendant filed the instant motion to dismiss on January 9, 2024.[1] Dkt. No. 13. After the Court granted Plaintiff's request for an extension, Plaintiff filed an opposition to Defendant's

---

[1] In support of its motion to dismiss, Defendant filed an affidavit of William P. Kelly that conveys Mr. Kelly's account of his interactions with Plaintiff, as well as several other extraneous documents. But these documents are "not attached to, referenced in, or integral to the Complaint." *Playboy Enters. Int'l Inc. v. Mediatakeout.com LLC*, 2016 WL 1023321, at *3 (S.D.N.Y. Mar. 8, 2016). As a result, "these factual allegations by the defendant are, of course, not cognizable on a motion to dismiss." *Taft v. Agric. Bank of China Ltd.*, 156 F. Supp. 3d 407, 422 (S.D.N.Y. 2016); *Maldonado Juarez v. Butterfield Catering Inc.*, 2020 WL 6945944, at *2

motion to dismiss on February 5, 2024.  Dkt. Nos. 15, 16, 19.  To date, Defendant has not
submitted a reply in support of its motion.

## LEGAL STANDARD

### I.   Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a
complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that
is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.
Twombly*, 550 U.S. 544, 557 (2006)).  "A claim has facial plausibility when the plaintiff pleads
factual content that allows the court to draw the reasonable inference that the defendant is liable
for the misconduct alleged."  *Id.*  This "does not impose a probability requirement at the pleading
stage" but rather "calls for enough fact to raise a reasonable expectation that discovery will
reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives,
Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).  That is, a complaint need not allege "detailed factual
allegations," but "a plaintiff's obligation to provide the grounds of his entitlement to relief
requires more than labels and conclusions, and a formulaic recitation of the elements of a cause
of action will not do."  *Twombly*, 550 U.S. at 555.

In reviewing a motion to dismiss under Rule 12(b)(6), a court "accept[s] all factual
allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor."  *Austin v. Town
of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016).  However, "the tenet that a court must accept
as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*,

---

(S.D.N.Y. Nov. 25, 2020).  Nor will the Court exercise its discretion "to convert the present
motion to dismiss to one for summary judgment."  *Guzman v. Bldg. Serv. 32BJ Pension Fund*,
2023 WL 2526093, at *5 (S.D.N.Y. Mar. 15, 2023).

556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."  *Id.*

The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Id.*  "Determining whether a complaint states a plausible

claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its

judicial experience and common sense."  *Id.* at 679.

## II.    Telephone Consumer Protection Act

Congress enacted the TCPA in 1991 in response to "[v]oluminous consumer complaints

about abuses of telephone technology."  *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370–71

(2012); *see also* Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243 § 2(5), 105

Stat. 2394, 2394 (1991) (codified at 47 U.S.C. § 227) (finding "[u]nrestricted telemarketing" was

"an intrusive invasion of privacy").  The heart of the TCPA consists of two subsections: Sections

227(b) and 227(c) of Title 47 of the U.S. Code.

Section 227(b) renders it "unlawful for any person . . . to make any call . . . using any

automatic telephone dialing system [('ATDS')] or an artificial or prerecorded voice," except in

an emergency or with the recipient's prior consent, to several enumerated categories of phones.

47 U.S.C. § 227(b)(1)(A).  For example, the prohibition on ATDSs or prerecorded calls extends

to "any emergency telephone line," "the telephone line of any guest room or patient room of a

hospital," and "any telephone number assigned to a paging service, cellular telephone service,

specialized mobile radio service, or other radio common carrier service."  *Id.*  Section 227(b)

further forbids "initiat[ing] any telephone call to any residential telephone line using an artificial

or prerecorded voice to deliver a message."  47 U.S.C. § 227(b)(1)(B).  The statute also

proscribes the "use any telephone facsimile machine, computer, or other device to send, to a

telephone facsimile machine, an unsolicited advertisement," except where *inter alia* the sender and recipient have an "established business relationship."  47 U.S.C. § 227(b)(1)(C).  Section 227(b) requires the FCC to "prescribe regulations to implement the requirements of this subsection."  47 U.S.C. § 227(b)(2).  In keeping with Congress's directive, the FCC promulgated those regulations at 47 C.F.R. § 64.1200(a)–(b).  Finally, Section 227(b) creates a private right of action "based on a violation of this subsection or the regulations prescribed under this subsection."  47 U.S.C. § 227(b)(3).

Section 227(c) is addressed to telephone solicitations that intrude on the privacy of the subscriber, regardless of whether they are transmitted by an ATDS or an artificial or prerecorded voice; it therefore has a markedly different scope and structure.  Section 227(c) required the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object."  47 U.S.C. § 227(c)(1); *see also id.* § 227(c)(2) (requiring the FCC to "prescribe regulations to implement methods and procedures for protecting the privacy rights described in [§ 227(c)(1)] in an efficient, effective, and economic manner and without the imposition of any additional charge to telephone subscribers").  Rather than dictating the contents of the regulations—as Congress did in Section 227(b)—Section 227(c) simply "permit[s]" the FCC to "require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, and to make that compiled list and parts thereof available for purchase."  47 U.S.C. § 227(c)(3).  Yet the TCPA provides that, if the FCC "determines to require such a database," then the regulations must "prohibit any person from making or transmitting a telephone solicitation to the telephone number of any subscriber included in such database."  47 U.S.C. § 227(c)(3)(F).  As relevant here, telephone solicitation is

defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 U.S.C. § 227(a)(4). Section 227(c) also confers a private cause of action on any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5).

The FCC exercised its authority under Section 227(c) by promulgating regulations that established a National Do Not Call Registry. As Congress mandated, those regulations prohibit any "person or entity" from "initiat[ing] any telephone solicitation to . . . [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2). Moreover, the FCC's regulations prohibit any "person or entity" from "initiat[ing] . . . any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity." 47 C.F.R. § 64.1200(d).[2] At minimum, those procedures must include the maintenance of "a written policy, available upon demand, for maintaining a do-not-call list," 47 C.F.R. § 64.1200(d)(1), and trainings for telemarketers on "the existence and use of the do-not-call list," 47 C.F.R. § 64.1200(d)(2).

---

[2] *See Rosenberg v. LoanDepot.com LLC*, 435 F. Supp. 3d 308, 324–25 (D. Mass. 2020) ("[Section] 64.1200(d) was promulgated under § 227(c) and contains a private right of action."); *Hossfeld v. DIRECTV, LLC*, 2023 WL 3549742, at *4 (C.D. Cal. Mar. 31, 2023) (same).

## DISCUSSION

Defendant argues that Plaintiff's TCPA claims fail on three separate grounds[3]:  First, Plaintiff's cellphone subscription does not render him a "residential telephone subscriber" for purposes of the TCPA and its implementing regulations.  Dkt. No. 13-1 at 24.  Second, the calls were not actionable telephone solicitations or telemarketing because they were not made for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services. *Id.* at 19.  Finally, the complaint does not adequately allege that Defendant initiated any calls to Plaintiff, nor that Defendant is vicariously liable for the actions of the telemarketers who did.  *Id.* at 6–7.  Plaintiff contests each of those assertions.  Dkt. No. 16 at 2–8.

## I.      Plaintiff's Use of a Cellphone

Defendant contends that Plaintiff is ineligible for relief under the TCPA because he received the challenged calls on a cellphone, rather than a landline phone.  Dkt. No. 13-1 at 23.  According to Defendant, that distinction is fatal to Plaintiff's TCPA claims since cellphone users cannot qualify as residential subscribers under the statute.  *Id.* at 24.  Plaintiff counters that both FCC regulations and statutory text refute Defendant's restrictive interpretation of the TCPA.  Dkt. No. 16 at 2–5.

The regulations the FCC promulgated pursuant to Section 227(c) of the TCPA govern the telephone solicitation and telemarketing practices of "residential telephone subscriber[s]."  47

---

[3] Defendant also asserts without elaboration that "Plaintiff's Complaint fails to plead an injury sufficient to establish standing to pursue a claim."  Dkt. No. 13-1 at 4.  But the Second Circuit has held that plaintiffs subjected to unwanted calls in violation of the TCPA have Article III standing because "the harms Congress sought to alleviate through passage of the TCPA closely relate to traditional claims, including claims for 'invasions of privacy, intrusion upon seclusion, and nuisance.'"  *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 93 (2d Cir. 2019) (quoting *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017)); *see also Gorss Motels, Inc. v. Lands' End, Inc.*, 997 F.3d 470, 476 (2d Cir. 2021); *Lenorowitz v. Mosquito Squad of Fairfield & Westchester Cnty.*, 2022 WL 4367596, at *3–4 (D. Conn. Sept. 21, 2022).

C.F.R. §§ 64.1200(c)(2), (d).  Notably, "[t]he rules set forth in paragraph (c) and (d) of

[Section 64.1200] are applicable to any person or entity making telephone solicitations or

telemarketing calls or text messages to *wireless* telephone numbers to the extent described in the

Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, 'Rules and Regulations

Implementing the Telephone Consumer Protection Act of 1991.'"  47 C.F.R. § 64.1200(e)

(emphasis added).  The pertinent FCC order, in turn, provides that "wireless subscribers may

participate in the national do-not-call list" and that the Commission "presume[s] wireless

subscribers who ask to be put on the national do-not-call list to be 'residential subscribers.'"  *In

Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014,

14039 (2003); *see also id.* at 14039 n.139 (explaining this presumption is "for the purposes of

section 227" of the TCPA).  Numerous courts have applied the presumption the FCC

incorporated into its TCPA regulations, and held that an individual who registers her cellphone

with the Do Not Call Registry is a residential telephone subscriber.[4]

However, Defendant contends that the FCC's interpretation of the TCPA is contrary to

the statute's plain text.  *See Loper Bright Enters. v. Raimondo*, 2024 WL 3208360, at *14 (U.S.

June 28, 2024) (holding that, even when a court interprets a statute that delegates authority to an

administrative agency, the court must nevertheless "independently interpret the statute and

effectuate the will of Congress subject to constitutional limits").  "The term 'residential

telephone subscriber' is not defined by the TCPA."  *Miholich v. Senior Life Ins. Co.*, 2022 WL

---

[4] *See, e.g.*, *Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1225 (9th Cir. 2022); *Klassen v. Solid
Quote LLC*, 2023 WL 7544185, at *2 (D. Colo. Nov. 14, 2023); *Tsolumba v. SelectQuote Ins.
Servs.*, 2023 WL 6146644, at *5 n.3 (N.D. Ohio Sept. 20, 2023); *Escano v. RCI LLC*, 2022 WL
17251273, at *16 (D.N.M. Nov. 28, 2022), *report and recommendation adopted*, 2023 WL
34525 (D.N.M. Jan. 4, 2023); *Powers v. One Techs., LLC*, 2022 WL 2992881, at *3 (N.D. Tex.
July 28, 2022); *Barton v. Temescal Wellness, LLC*, 525 F. Supp. 3d 195, 202 (D. Mass. 2021);
*see also Murray v. Grocery Delivery E-Servs. USA Inc.*, 55 F.4th 340, 348 (1st Cir. 2022).

410945, at *4 (S.D. Cal. Feb. 10, 2022).  But Defendant observes that "the term 'cellular telephone'" appears in Section 227(b).  Dkt. No. 13-1 at 24.  As stated above, Section 227(b) prohibits any person from using an "automatic telephone dialing system or an artificial or prerecorded voice" to call "any telephone number assigned to a paging service, *cellular telephone service*, specialized mobile radio service, or other radio common carrier service."  47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added).  Defendant argues that "under the *expressio unius est exclusio alterius* canon of interpretation [i.e., that the expression of one thing is the exclusion of the other] . . . the conspicuous absence of any reference to cellular telephones in section 227(c) evidences Congress' intent to exclude cell phones users from the definition of 'residential subscribers.'"  Dkt. No. 13-1 at 24.

Defendant's interpretation of the TCPA would have sweeping "practical consequences." *United States v. Worldwide Indus. Enters., Inc.*, 220 F. Supp. 3d 335, 345 (E.D.N.Y. 2016) (Bianco, J.) (quoting *Cmty. Health Care Ass'n of N.Y. v. Shah*, 770 F.3d 129, 151 (2d Cir. 2014)).  For more than two decades, cellphone users have been permitted by the FCC to register for the National Do Not Call Registry as "residential subscribers."  *See* 18 F.C.C. Rcd. at 14038–39.  Countless cellphone users have relied upon that protection to ensure their privacy.[5]  They have purchased cellphones on the assumption that their devices would be protected against unwanted telemarketing.  Telemarketing firms have developed policies and practices to comply with their Do Not Call obligations for cellphone users.  *See* 47 C.F.R. § 64.1200(d).  The FCC,

---

[5] The Registry does not "keep a record of whether the numbers [on it] are land line or cell phones."  *The Do Not Call Registry*, Fed. Trade Comm'n, https://www.ftc.gov/news-events/topics/do-not-call-registry (last visited July 1, 2024).  Thus, it is unclear how the government could even adhere to a ruling requiring the Registry to purge the unknown number of cellphones from the "more than 221 million telephone numbers on it" without depriving perhaps hundreds of millions of users of the protection which they believed they were entitled to receive by jettisoning the existing database to start anew.  *Id.*

Federal Trade Commission, and state agencies alike have enforced the rights of cellphone users

on the Registry.  *See* 18 F.C.C. Rcd. at 14034.  As Americans increasingly "no longer maintain

wireline phone service, and rely only on their wireless telephone service," *id.* at 14039,

Defendant's interpretation of the TCPA would effect a sea change in the telemarketing industry

and leave many consumers without protections that they have long enjoyed.  There is little doubt

that if the Court were to apply the deference owed to the FCC's interpretation of the TCPA at the

time Congress enacted the statute, the Court would uphold the FCC's interpretation as

reasonable.  *See, e.g.*, *Sagar v. Kelly Auto. Grp., Inc.*, 2021 WL 5567408, at *6 (D. Mass. Nov.

29, 2021); *Craig Cunningham v. Technologic USA, Inc.*, 2020 WL 10356245, at *6 (D. Wyo.

June 17, 2020).  But the Court need not defer to an agency interpretation here.[6]  "[A]fter

applying all relevant interpretative tools," *Loper Bright*, 2024 WL 3208360, at *16, the Court

concludes that users of cellphones are not categorically excluded from the definition of

"residential subscriber" under the TCPA.

Defendant's reliance on the *expressio unius* canon is misplaced.  That canon is instructive

only when "it is fair to suppose that Congress considered the unnamed possibility and meant to

say no to it."  *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 370 (2d Cir. 2006) (quoting

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003)).  As a result, *expressio unius* requires

"identifying a series of two or more [distinct] terms or things that should be understood *to go*

---

[6] Although the Court concludes that the TCPA confirms the FCC's interpretation of "residential
subscriber," the Court pauses to note that this case highlights the disruption that the Supreme
Court's recent decision in *Loper Bright* portends.  Regulatory regimes that have been settled for
decades are now subject to de novo review in private disputes such as this one, without the
benefit of briefing from the expert agency tasked with administering the relevant statute.  But the
force of any particular judicial opinion—even one issued by the Supreme Court—can be
measured only by its ability to stand the test of time.  And, as Justice Gorsuch reminds, the
Supreme Court "from time to time . . . has found it necessary to correct its past mistakes."  *Id.* at
*27 (Gorsuch, J., concurring).

*hand in hand*, which is abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded." *Fernandez v. Zoni Language Ctrs., Inc.*, 858 F.3d 45, 53 (2d Cir. 2017) (quoting *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002)). Yet the "contention that the statute divides cellular phones and residential phones into two discrete and exclusive worlds is unpersuasive; it simply runs counter to the text enacted by Congress." *Mantha v. QuoteWizard.com, LLC*, 2022 WL 325722, at *4 (D. Mass. Feb. 3, 2022).

Section 227(b) differs from Section 227(c) in that the former forbids the use of artificial and prerecorded messages to enumerated categories of phone technologies.  Those include "cellular telephone[s]" and "residential telephone *line*[*s*]," as well as a variety of other specific technologies like "emergency telephone line[s]," "paging service[s]," and "radio common carrier service[s]." 47 U.S.C. § 227(b)(1)(A)–(B) (emphasis added).  Section 227(b)'s technological focus is similarly evident in its proscription on the "use [of] any telephone facsimile machine, computer, or other device" to send an unsolicited advertisement "to a telephone facsimile machine." 47 U.S.C. § 227(b)(1)(C).  Defendant's *expressio unius* argument therefore amounts to a category mistake:  Cellular telephones—like telephone lines, paging services, radio common carrier services, and telephone facsimile machines—are a kind of telephonic communications technology.

A "residential subscriber," by contrast, does not refer to the specific phone technology, but to the type or identity of the subscriber to the technology.  Thus, a "residential subscriber" and a cellular telephone are not members of the same genus.  The inclusion of that term in Section 227(b) and its exclusion from Section 227(c) does not connote that Congress intentionally omitted cellphones used by "residential subscribers" from Section 227(c)'s protections or defined "residential subscriber" by the form of technology used by the subscriber.

Rather, Congress used the term "line" and not "subscriber" to refer to a fixed line dedicated to a particular location.  "Had Congress wished to limit section 227(c) to specified telephone technologies rather than specified telephone subscribers, it would have indicated somewhere in that section that the [Do Not Call] registry is limited to a 'residential telephone *line*,' as Congress used that term in the preceding subsection."  *Jackson v. Direct Bldg. Supplies LLC*, 2024 WL 184449, at *6 (M.D. Pa. Jan. 17, 2024) (emphasis in original); *see also Chennette*, 50 F.4th at 1227 (Bress, J., concurring).

Defendant's interpretation also presumes that the term "residential," as used in the phrase "residential subscriber," denotes a landline, not a cellphone, such that only persons who subscribe to landlines and not those who subscribe to a cellphone can be residential subscribers. *See* Dkt. No. 13-1 at 24.  Carried to its logical limits, that argument would admit of absurd consequences—ones that Congress could not have intended and contrary to Congress's purposes. *See Pereira v. Sessions*, 585 U.S. 198, 212 (2018) ("We are not willing to impute to Congress . . . [an] absurd purpose." (quoting *United States v. Bryan*, 339 U.S. 323, 342 (1950))); *see also Yates v. United States*, 574 U.S. 528, 536 (2015).  Under Defendant's interpretation, an individual who eschews landline service and who uses a cellphone exclusively in his residence (perhaps because he is homebound) would be deprived of the TCPA's protection simply because his phone lacks a cord.

Congress's language does not lead to that result.  The Court interprets the TCPA "as a whole," *United States v. Kennedy*, 233 F.3d 157, 162 (2d Cir. 2000) (Sotomayor, J.) (quoting *Connecticut v. U.S. Dep't of the Interior*, 228 F.3d 82, 89 (2d Cir.2000)), "giv[ing] effect, if possible, to every clause and word of [the] statute," *United States v. Davis*, 961 F.3d 181, 188 (2d Cir. 2020) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).  Because the Court

ascribes meaning to Congress's particular choice of words, "language used in one portion of a statute . . . should be deemed to have the same meaning as the same language used elsewhere in the statute," *United States v. Daugerdas*, 892 F.3d 545, 556 (2d Cir. 2018) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 260 (1993)), while "statutory use of different terms evinces intent to express different meanings," *Union of Needletrades, Indus. & Textile Emps., AFL-CIO, CLC v. INS*, 202 F. Supp. 2d 265, 271 (S.D.N.Y. 2002), *aff'd*, 336 F.3d 200 (2d Cir. 2003). Considered in a vacuum, the term "residential subscriber" is ambiguous as to whether it is limited to landlines.  *See Enters. Rent-A-Car Co. v. Advantage Rent-A-Car, Inc.*, 330 F.3d 1333, 1341 (Fed. Cir. 2003) ("The language of the statute standing alone and divorced from its context, purpose, and history is perhaps ambiguous.").  However, the TCPA's text, structure, and purpose demonstrate that the term "residential subscriber" is indifferent to technology.

In Section 227(b), Congress used the word "*line*," in making it unlawful to initiate a telephone call to a "residential telephone line" with an artificial or prerecorded voice.  47 U.S.C. § 227(b)(1)(B).  And, in Section 227(c), Congress directed the FCC to regulate with respect to "residential telephone subscribers' privacy rights."  47 U.S.C. § 227(c)(1).  The term "residential" cannot refer to the telephone technology.  Were that so, Congress's reference to a residential telephone "line" would be surplusage, as a residential telephone would necessarily be a landline instead of a cellphone; Congress could just as easily have referred to a residential telephone, and not to a residential telephone line.  *See Adelson v. Harris*, 973 F. Supp. 2d 467, 497 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017).  The term "line" must be given meaning and it is evident from its context that the meaning it must receive is that it refers to the equipment or technology.  Just as Section 227(b)(1)(A)(ii)'s reference to the "telephone line of any guest room or patient room" of a hospital or similar facility means the equipment attached to

15

that room and not just a phone that can be used in a guest room, so too must "residential telephone line" in Section 227(b)(1)(B) be read to refer to equipment that is dedicated to a residence and not just one that can be used in a residence.[7]  *See Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992) (noting "the basic canon of statutory construction that identical terms within an Act bear the same meaning").

Since Congress's use of the word "line" in Section 227(b) must be understood to refer to the nature of the equipment, it follows that Congress's omission of the word "line" in Section 227(c) and its substitution of that word with "subscriber" demonstrates that Section 227(c)'s applicability depends on the type of subscriber and the function for which the subscriber uses the phone rather than on the particular technology the subscriber uses.  *See Mantha*, 2022 WL 325722, at *4 (holding that "residential" is "a functional term not tethered to a particular technology").

Construing the TCPA according to its plain language, a "residence" is simply "[t]he place where one actually lives," that is, one's "dwelling."  *Residence*, Black's Law Dictionary (11th ed. 2019).  And "residential" means "of or relating to residence or residences."  *Residential*, Merriam-Webster Dictionary (2024), https://www.merriam-webster.com/dictionary/residential. A "subscriber" is "[a] person who makes a regular payment in return for entitlement to . . . access to a commercially provided service."  *Subscriber*, Oxford English Dictionary (2024), https://www.oed.com/dictionary/subscriber.  Thus, a residential subscriber is one who maintains a phone "for residential purposes," *Gillam v. Reliance First Cap., LLC*, 2023 WL 2163775, at *4 (E.D.N.Y. Feb. 22, 2023)—i.e., for personal activities associated with his or her private,

---

[7] Instead, an individual who receives a call with an artificial or prerecorded voice on her cellphone can seek relief pursuant to Section 227(b)(1)(A)(iii).  *See Jiminez v. Credit One Bank, N.A.*, 2019 WL 6251369, at *1 (S.D.N.Y. Nov. 22, 2019).

domestic life, *see Rose v. New TSI Holdings, Inc.*, 2022 WL 912967, at *2 (S.D.N.Y. Mar. 28, 2022); *Marks v. Unique Lifestyle Vacations, LLC*, 2021 WL 5495778, at *3 (E.D. Pa. Nov. 22, 2021); *Izor v. Abacus Data Sys., Inc.*, 2019 WL 3555110, at *2 (N.D. Cal. Aug. 5, 2019).

Statutory context confirms that reading.  *See generally Diaz v. United States*, 2024 WL 3056012, at *6 (U.S. June 20, 2024) ("[A] word's meaning is informed by its surrounding context.").  Congress used the term "residential" in "the broader sense of 'relating to a resident' to distinguish such a subscriber from a business or commercial telephone subscriber." *Jackson*, 2024 WL 184449, at *5); *see Rose*, 2022 WL 912967, at *2; *Blalack v. RentBeforeOwning.com*, 2022 WL 7320045, at *4 (C.D. Cal. Oct. 11, 2022); *see also Shelton v. Fast Advance Funding, LLC*, 805 F. App'x 156, 159 (3d Cir. 2020).  Congress's definition of an "established business relationship"—a term that is used to exempt from the statute certain communications that are made for business purposes, *see* 47 U.S.C. § 227(b)(1)(C)(i)—expressly distinguishes between a business subscriber and a residential subscriber.  The definition states that the term "established business relationship" shall have the meaning given by regulation except that "such term shall include a relationship between a person or entity and a *business subscriber* subject to the same terms applicable under such section to a relationship between a person or entity and a *residential subscriber*."  47 U.S.C. § 227(a)(2)(A) (emphasis added).  That distinction would make little sense if the term "residential subscriber" referred to users with landlines physically located in their residences, rather than users who use their phones for residential purposes, because many individuals operate home-based businesses.  *See Chennette*, 50 F.4th at 1224–25 (explaining when a subscriber's use of a phone for a home-based business renders her no longer a residential subscriber under Section 227(c)).  The FCC has also adopted that view in regulations—albeit under a different telecommunications statute—defining "residential subscriber" as "a subscriber

to telephone exchange service that is not a business subscriber."  47 C.F.R. § 64.2305(d); *see*

*also Rose*, 2022 WL 912967, at *2; *Katz v. CHW Grp., Inc.*, 2023 WL 6445798, at *5 (W.D.

Ark. Sept. 29, 2023); *Ailion v. Healthcare Sols. Team, LLC.*, 2023 WL 2333299, at *5 (N.D. Ill.

Mar. 2, 2023).

      In addition to its textual argument, Defendant offers a purposive one: the rationale of the

prohibition on contacting phones on the Do Not Call Registry "is to preserve the heightened

privacy interests that people have within their homes," whereas "[c]alls to cell phones do not

pose a threat to privacy interests in the home because such devices are mobile and can easily be

silenced." Dkt. No. 13-1 at 25.  Defendant is correct that statutory purpose is relevant, but

Defendant draws the wrong conclusion from that purpose.  When construing a statute, a court

must "interpret the relevant words not in a vacuum, but with reference to the statutory . . .

purpose." *Abramski v. United States*, 573 U.S. 169, 179 (2014) (internal quotation marks

omitted).  Congress enacted the TCPA to safeguard consumers from the "intrusive invasion[s] of

privacy" from unwanted calls.  105 Stat. at 2394.  Congress's interest in Section 227(c) was in

the person and province that was being invaded and not simply in the technology through which

the invasion was effected.  It thus is perfectly consonant with the statute that residential

subscriber would be read to include those individuals who use a cellphone for household

purposes.  Indeed, given individuals' profound privacy interests in the security and seclusion of

their cellphones, courts have acknowledged the importance of "[p]reventing the phone (at home

or in one's pocket) from frequently ringing with unwanted calls." *Patriotic Veterans, Inc. v.

Zoeller*, 845 F.3d 303, 305 (7th Cir. 2017) (Easterbrook, J.).  "[T]elemarketing calls to personal

cellphones [can] pose a *greater* invasion of privacy to telephone subscribers than do

telemarketing calls to landline phones, because they can invade one's privacy at any time and in

any place." *Jackson*, 2024 WL 184449, at *7 (emphasis in original).  Additionally, while Defendant is correct that cellphones can typically be silenced, so too can a ringer on a landline. Congress sought to protect phone users without "plac[ing] an inordinate burden on the consumer."  105 Stat. at 2394.  Requiring individuals to silence their cellphones to avoid intrusions from unwanted calls would do nothing to address the concerns that inspired the TCPA. *See* S. Rep. No. 102-177, at 2 (1991) ("[U]nsolicited calls placed to . . . cellular or paging telephone numbers, often impose a cost on the called party . . . [as] cellular users [often] must pay for each incoming call.").  The Court therefore concludes that extending Section 227(c) to residential subscribers' cellphones is consistent with the TCPA's statutory purpose.

The Complaint amply alleges that Plaintiff was a residential subscriber under the TCPA notwithstanding his use of a cellphone.  Plaintiff personally registered his cellphone with the National Do Not Call Registry.  Dkt. No. ¶¶ 38–39.  That cellphone is "Plaintiff's personal phone that he uses for personal, family, and household use."  *Id.* ¶ 97.  Indeed, Plaintiff "maintains no landline phones at his residence and has not done so for at least 15 years and primarily relies on cellular phones to communicate with friends and family."  *Id.*  The Complaint enumerates the domestic tasks that he performs with his phone, including "sending and receiving emails, timing food when cooking, and sending and receiving text messages," and avers that "the phone is not primarily used for any business purpose."  *Id.*  Collectively, these allegations exceed "conclusory" boilerplate, *Gillam v. Reliance First Cap., LLC*, 2023 WL 2163775, at *4 (E.D.N.Y. Feb. 22, 2023), and adequately plead that Plaintiff used his cellphone for residential purposes, such that he was a residential subscriber for purposes of the TCPA and its implementing regulations.

The Court therefore rejects Defendant's contention that Plaintiff falls outside the TCPA's protective ambit merely because he received the challenged calls on his cellphone.[8]

## II.    Purpose of the Calls

Next, Defendant argues that the complaint fails to state a claim under the TCPA because "Plaintiff does not allege that the [challenged] calls were to encourage the purchase of services." Dkt. No. 13-1 at 19.  Defendant stresses that, when Plaintiff engaged the callers, he received a "retainer agreement [that] was on a contingency basis" so "he was not asked to pay for anything."  *Id.*  Plaintiff responds that "Defendant did not offer their services to Plaintiff for free" since "Plaintiff was purchasing the legal services of Defendant" regardless of "[w]hether Plaintiff paid upfront, made payments periodically, or paid pursuant to a settlement (on contingency)."  Dkt. No. 16 at 6.

As stated above, the FCC regulations at issue impose restrictions on those engaged in "telephone solicitation[s]," 47 C.F.R. § 64.1200(c)(2), and "call[s] for telemarketing purposes," 47 C.F.R. § 64.1200(d).  Those regulations clarify that "telephone solicitation means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services,"[9] 47 C.F.R. § 64.1200(f)(15); *accord* 47 U.S.C. § 227(a)(4), and likewise that "telemarketing means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or

---

[8] Because the Court concludes that Plaintiff's allegations satisfy both the plain text of the TCPA and the FCC's implementing regulations, the Court need not address the difficult—and entirely unbriefed—question of whether the Hobbs Act constrains the Court's review of the FCC's determination that cellphones qualify for TCPA protection.  *See Tsolumba v. SelectQuote Ins. Servs.*, 2023 WL 6146644, at *5 n.3 (N.D. Ohio Sept. 20, 2023); *Tessu v. AdaptHealth, LLC*, 2023 WL 5337121, at *5 (D. Md. Aug. 17, 2023); *see also PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1 (2019).

[9] The FCC's definition of telephone solicitation also includes three exceptions that are not relevant to this case.  *See* 47 C.F.R. § 64.1200(f)(15)(i)–(iii).

services," 47 C.F.R. § 64.1200(f)(13).  Because "identical words used in different parts of the same [regulation] are generally presumed to have the same meaning," *Bruce Katz, M.D., P.C. v. Focus Forward, LLC*, 22 F.4th 368, 372–73 (2d Cir. 2022) (per curiam) (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005)), Plaintiff's TCPA claims rest on a common contention: that the calls Plaintiff received were made "for the purpose of encouraging the purchase [of] . . . services."  47 C.F.R. §§ 64.1200(f)(13), (15).  To discern a caller's purpose, the Court must consider both the content of the call as well as its context.  *See Golan v. Veritas Ent., LLC*, 788 F.3d 814, 820 (8th Cir. 2015).  The inquiry also demands "a measure of common sense." *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012).

Defendant's offer to represent Plaintiff clearly qualifies as an offer of services.  *See Children's Apparel Network Ltd. v. Twin City Fire Ins. Co.*, 2019 WL 3162199, at *4 (S.D.N.Y. June 26, 2019) ("[T]he plain meaning and common usage of the term 'service,' . . . includes professional services, such as legal representation and advice.").  Accordingly, the parties instead dispute whether the challenged calls encouraged the "purchase" of Defendant's legal services. *See* Dkt. Nos. 13-1 at 18, 16 at 6.

Defendant suggests that Plaintiff would not have purchased Defendant's services by entering into the representation agreement, because any payments to Defendant would ultimately be satisfied by a third party—namely, a recovery from the federal government.  *See* Dkt. No. 13-1 at 19.  Courts have proven skeptical of arguments that TCPA liability attaches to calls that encourage the recipient to use services that are purchased and paid for by a third party.  *See, e.g.*, *Hulce v. Zipongo, Inc.*, 2024 WL 1251108, at *4 (E.D. Wis. Mar. 18, 2024) (call urged plaintiff to sign up for nutritional consulting services that were free under his health plan, but which his insurer funded); *Trujillo v. Free Energy Sav. Co., LLC*, 2020 WL 7768722, at *2–3 (C.D. Cal.

Dec. 21, 2020) (call informed plaintiff of free weatherization services that plaintiff's utility company purchased).  But those courts were not skeptical of the plaintiffs' claims because a third party would pay for the service.  Rather, they focused on the fact that in those cases, the calls urged plaintiffs to use free services without encouraging plaintiff or any third party to purchase them.  *See Hulce*, 2024 WL 1251108, at *4 ("[T]he communications were not targeted at [the insurer] in any way.  The calls did not, for example, ask plaintiff to encourage [the insurer] to add [defendant's] services to his health plan.  Thus, the communications did not encourage anyone to make a purchase."); *Trujillo*, 2020 WL 7768722, at *3 ("The text messages themselves do not evince any intent to secure a purchase by [the utility company]; instead, they invite the recipient to schedule free services.").  As a result, these cases differ fundamentally from the facts here: the challenged calls allegedly sought to encourage *Plaintiff* to contract with Defendant and to direct a portion of a future right to payment to Defendant.  While those funds would originate from a third party, the calls urged the relevant decisionmaker—namely, Plaintiff—to allocate those funds.  Thus, deeming the calls here to be telephone solicitations or telemarketing would not improperly "separat[e] the encouragement element from the purchasing element."  *Hulce*, 2024 WL 1251108, at *4.

In a similar vein, Defendant contends the Court must conclude that the callers did not encourage Plaintiff to "purchase" Defendant's services, because Plaintiff was "not asked to pay" for them.  Dkt. No. 13-1 at 19.  Although the representation agreement did not require Plaintiff to pay monies directly to Defendant, the Court must apply "common sense" rather than rigid formalism to decide whether the calls sought to encourage a purchase of services.  *Chesbro*, 705 F.3d at 918.  Looking to the substance of the fee arrangement, the Court determines that this is not the "rare case" in which a call touts services that are entirely free of charge.  *Hill v.*

*InvestorPlace Media, LLC*, 2024 WL 1056030, at *4 (W.D.N.C. Mar. 11, 2024) (quoting *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 80 F.4th 466, 476 (4th Cir. 2023)). Instead, under the representation agreement, Plaintiff would purchase Defendant's legal services by accepting a reduced damages award from the government.  Put differently, by signing the representation agreement, Plaintiff became obligated to provide Defendant a portion of the damages award that Plaintiff received from the government.  It matters little whether that payment would travel through the hands of the Plaintiff en route to Defendant or would be provided directly by the government.  *See Jang v. Bos. Sci. Scimed, Inc.*, 729 F.3d 357, 363 (3d Cir. 2013) ("Courts have long recognized the equivalence of a debt offset and a cash payment."). Plaintiff agreed to accept a lesser damages award from the government and that a portion of the damages award would be given to Defendant in exchange for Defendant's provision of legal services.

A simple example illustrates the point:  A homeowner wishes to sell her house, so she hires a real estate agent to list the building, find a suitable buyer, and close the sale.  To compensate the real estate agent, the homeowner agrees to pay him a three percent commission from the ultimate sale price.  The homeowner thereby purchases the real estate agent's listing services by promising him a percentage of the sale price.  Courts have straightforwardly held that a person who is solicited to pay a portion of his ultimate sales price to an agent in exchange for listing services has purchased a service.  *See McMorrow v. Core Properties, LLC*, 2023 WL 8697795, at *11 (E.D. Mo. Dec. 15, 2023) (concluding plaintiff purchased real-estate sales services in the form of a lower sale price for his house); *see also Anderson v. Catalina Structured Funding, Inc.*, 2021 WL 8315006, at *5 (W.D. Mich. Dec. 21, 2021) (explaining, when defendant converted plaintiff's structured settlement into a lump sum, that "just because the fees

may be taken out of the lump sum payment to the payee rather than itemized does not mean that no fees were charged in connection with the transaction"), *report and recommendation adopted*, 2022 WL 3643733 (W.D. Mich. Aug. 24, 2022).  The same conclusion follows here where the services Plaintiff was solicited for related to his chose in action.

Defendant counters that characterizing the representation agreement as Plaintiff's purchase of legal services from Defendant would get the transaction precisely backwards, since *Defendant* effectively sought to make a purchase from *Plaintiff*.  *See* Dkt. No. 13-1 at 20.  In its view, Defendant purchased a portion of Plaintiff's claim from Plaintiff.  Defendant analogizes to *Murphy v. DCI Biologicals Orlando, LLC*, in which the defendants sent text messages to plaintiff asking him to donate his blood in exchange for a payment.  2013 WL 6865772, at *10 (M.D. Fla. Dec. 31, 2013), *aff'd*, 797 F.3d 1302 (11th Cir. 2015).  The district court held that the messages did not constitute solicitation, as the messages did not encourage a purchase, but rather a sale. *Id.* ("Because neither of the messages in this case encouraged [plaintiff] to purchase, rent, or invest in anything, they do not constitute 'telephone solicitations' under the TCPA.  On the contrary, one message asked [plaintiff] to sell his blood to [defendant].").  Other courts have similarly held that "telephone solicitations are calls intending to encourage a purchase by the listener, not the caller.  Calls asking to purchase the listener's labor, blood, or other service are not telephone solicitations."  *Orea v. Nielsen Audio, Inc.*, 2015 WL 1885936, at *3 (N.D. Cal. Apr. 24, 2015); *see also Edelsberg v. Vroom, Inc.*, 2018 WL 1509135, at *5 (S.D. Fla. Mar. 27, 2018); *Friedman v. Torchmark Corp.*, 2013 WL 1629084, at *4 (S.D. Cal. Apr. 16, 2013).

But an attorney's representation of a client on a contingency basis is emphatically not a purchase of the client's claim.[10]  "[T]he contingent-fee lawyer [is not] a joint owner of his

---

[10] Nor does Defendant explain—much less demonstrate—how the representation agreement

client's claim in the legal sense any more than the commission salesman is a joint owner of his

employer's accounts receivable." *Comm'r v. Banks*, 543 U.S. 426, 436 (2005) (alterations in

original) (quoting *Kenseth v. Comm'r*, 259 F.3d 881, 883 (7th Cir. 2001) (Posner, J.)); *see also*

*Pal v. Sinclair*, 90 F. Supp. 2d 393, 398 (S.D.N.Y. 2000).  Even if an attorney provides legal

services pursuant to a "contingent-fee agreement[,]" the client retains "the ultimate authority to

control his affairs; thus, he may settle a claim, regardless of his attorney's efforts to prosecute it."

*King & King, Chartered v. Harbert Int'l, Inc.*, 503 F.3d 153, 156 (D.C. Cir. 2007); *see also Pu v.*

*Russell Publ'g Grp., Ltd.*, 2016 WL 9021990, at *6 (S.D.N.Y. Sept. 2, 2016), *aff'd*, 683 F. App'x

96 (2d Cir. 2017) (summary order).  Accordingly, the Court concludes that the challenged calls

here were not attempts to purchase anything from Plaintiff.  *See Banks*, 543 U.S. at 436; *see also*

*Benci-Woodward v. Comm'r*, 219 F.3d 941, 943 (9th Cir. 2000) ("[I]n litigation an attorney

conducts for a client he acquires no more than a professional interest.  To hold that a contingent

fee contract . . . gives the attorney the beneficial rights of a real party in interest . . . would be to

demean his profession." (quoting *Isrin v. Superior Ct. of L.A. Cnty.*, 403 P.2d 728, 733 (Cal.

1965) (Mosk, J.)).

Additionally, Defendant suggests that the connection between the calls and the

representation agreement was too attenuated because none of the calls directly mentioned

Defendant's legal services.  *See* Dkt. No. 13-1 at 19.  But a caller need only "encourag[e]" the

recipient to purchase a service to fall under the relevant regulations.  47 C.F.R.

§§ 64.1200(f)(13), (15).  As a result, "the fact that a sale is not completed during the call or

message does not mean the message does not constitute a telephone solicitation or unsolicited

---

would constitute the purchase of any services from Plaintiff.  Cases concerning unwanted calls
regarding "employment opportunit[ies]" are therefore inapposite here.  *See, e.g.*, *Gerrard v.*
*Acara Sols. Inc.*, 469 F. Supp. 3d 96, 99 (W.D.N.Y. 2020).

advertisement." *Alleman v. Yellowbook*, 2013 WL 4782217, at *4 (S.D. Ill. Sept. 6, 2013) (quoting *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 20 F.C.C. Rcd. 3788, 3804 (2005)); *cf. Golan v. Veritas Ent., LLC*, 788 F.3d 814, 820 (8th Cir. 2015); *Hill*, 2024 WL 1056030, at *4 ("[T]he text messages offering [free] investment advice were a pitch meant to draw recipients to Defendant's website where they presumably would be encouraged to purchase a subscription.").

Plaintiff's assertion that the representation agreement entails a purchase of legal services raises a final query: whether the actual payment of Defendant under the agreement is too remote or contingent to establish a purchase. *Cf. Suttles v. Facebook, Inc.*, 461 F. Supp. 3d 479, 484 (W.D. Tex. 2020) ("The link between text messages urging a website visit and any possible purchase, rental, or investment is too weak to qualify as a telephone solicitation under the Act."). While the representation agreement Defendant offered Plaintiff would not have required Plaintiff to pay Defendant immediately, the Court determines that the agreement was sufficiently binding to constitute a purchase of legal services. "Under New York law, a lawyer may be discharged at any time, with or without cause." *Simon v. Sack*, 451 F. App'x 14, 16 (2d Cir. 2011) (summary order). However, "[i]f the lawyer is discharged without cause and prior to the conclusion of the case, however, he or she may recover either (1) in *quantum meruit*, the fair and reasonable value of the services rendered, or (2) a contingent portion of the former client's ultimate recovery, but only if both of the parties have so agreed." *Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 263 (2d Cir. 2004); *see Smith v. Boscov's Dep't Store*, 596 N.Y.S.2d 575, 576 (3d Dep't 1993) ("Recovery on a quantum meruit basis is called for even where the attorney discharged without fault was employed under a contingent fee contract."); *see also Judd Burstein, P.C. v. Long*, 180 F. Supp. 3d 308, 313 (S.D.N.Y. 2016). Although

Defendant's compensation was contingent upon obtaining a recovery in a case that could take months or years to litigate, Defendant would have gained a binding right to fees as soon as Plaintiff entered the representation agreement.  *See In re Pan Am Corp.*, 1995 WL 606283, at *3 (S.D.N.Y. Oct. 13, 1995); *Shmueli v. NRT New York, Inc.*, 910 N.Y.S.2d 902, 903 (1st Dep't 2010).  The representation agreement's use of a contingency fee structure thus did not render the possibility of payment so remote or uncertain as to preclude Plaintiff from pleading that the challenged calls encouraged the purchase of legal services.

Based on the content and context of the alleged calls, Plaintiff has adequately pleaded that their purpose was to encourage him to purchase Defendant's legal services by entering into a representation agreement for claims arising out of injuries sustained at Camp Lejeune. Defendant offers several formalistic arguments to the contrary.  But "[i]n this field," as in many others, "realism, not formalism, should be dominant; the problem must be solved in the light of commercial actuality, not in the aura of juristic semantics."  *Echeverry v. Kellogg Switchboard & Supply Co.*, 175 F.2d 900, 903 (2d Cir. 1949).  Accordingly, the Court concludes that the alleged calls constituted telephone solicitations and telemarketing for purposes of the TCPA and its implementing regulations.

## III.   Direct and Vicarious Liability

Defendant contends that Plaintiff's TCPA claims nevertheless fail to state a claim for a separate reason: the complaint does not aver that Defendant placed the challenged calls, nor that Defendant is vicariously liable for the acts of the telemarketers.  Dkt. No. 13-1 at 6.  Plaintiff responds that he "has pleaded enough" to warrant "discovery to ascertain the relationship between the anonymous telemarketer[s]" and Defendant.  Dkt. No. 16 at 6.

The TCPA provides that "[a] person who has received more than one telephone call within any 12-month period *by or on behalf of* the same entity in violation of the regulations prescribed under this subsection may" bring a private lawsuit.[11]  47 U.S.C. § 227(c)(5).

Courts have interpreted § 227(c)(5) as permitting a plaintiff to hold a defendant liable "under 'theories of [either] direct or vicarious liability.'"  *Scruggs v. CHW Grp., Inc.*, 2020 WL 9348208, at *8 (E.D. Va. Nov. 12, 2020) (quoting *Aaronson v. CHW Grp., Inc.*, 2019 WL 8953349, at *2 (E.D. Va. Apr. 15, 2019)); *see Oparaji v. Home Retention Corp.*, 2022 WL 987560, at *10 (E.D.N.Y. Jan. 11, 2022) ("This language permits actions under a vicarious liability theory against persons or entities who did not directly place the solicitation call in question."), *report and recommendation adopted*, 2023 WL 2155764 (E.D.N.Y. Feb. 22, 2023); *see also Schleifer v. Lexus of Manhattan*, 2018 WL 11593271, at *5 (S.D.N.Y. Nov. 21, 2018) (Nathan, J.) ("[V]icarious liability is necessary to give meaning to the statute's purpose, since allowing companies to shield themselves from liability simply by contracting with a third-party would de facto defeat the TCPA's protections."); *see also Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 168 (2016).  A seller of services thus cannot do indirectly through an agent what Section 277(c) would prohibit it from doing directly.  That conclusion finds further support in the presumption that "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules."[12]  *Meyer v. Holley*, 537 U.S. 280, 285 (2003); *see Krakauer v. Dish*

---

[11] Because Section 227(c)(5) does not specify "who may be held liable for injuries covered by the statute," the Court looks to the "traditional tort law" principles governing direct and vicarious liability discussed below.  *Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F.3d 1000, 1010 (7th Cir. 2002).

[12] The Court need not address whether that presumption is sufficient to establish vicarious liability under Section 227(b), whose private cause of action does not expressly contemplate "on behalf of" liability.  *Compare Mais v. Gulf Coast Collection Bureau, Inc.*, 944 F. Supp. 2d 1226,

*Network, LLC*, 925 F.3d 643, 659 (4th Cir. 2019) (applying *Meyer* to the TCPA); *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 877 (9th Cir. 2014) (same), *aff'd*, 577 U.S. 153; *see also Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 76 (2d Cir. 2021) (en banc).  "The federal common law of agency is in accord with the Restatement."  *Jackson v. Caribbean Cruise Line, Inc.*, 88 F. Supp. 3d 129, 138 (E.D.N.Y. 2015); *see Hodgin v. UTC Fire & Sec. Americas Corp.*, 885 F.3d 243, 252 (4th Cir. 2018).  Federal common therefore recognizes "not only formal agency, but also principles of apparent authority and ratification."  *Dish Network, LLC*, 28 F.C.C. Rcd. at 6574; *see Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021); *Jackson*, 88 F. Supp. 3d at 136.

Plaintiff has not alleged that Defendant is directly liable for the challenged calls.  "[F]or direct liability, a plaintiff must allege that a defendant initiated an unlawful call in order to state a plausible claim."  *Banks v. Pro Custom Solar*, 416 F. Supp. 3d 171, 173 (E.D.N.Y. 2018).  The Complaint asserts that "Defendant MKLLP called Plaintiff at least thirty-five (35) times."  Dkt. No. 1 ¶ 44; *see also id.* ¶ 57.  However, that general statement is contrary to the Complaint's more specific allegations that Defendant "hired anonymous telemarketers to place [the] telephone solicitation phone calls" to Plaintiff's cellphone.  *Id.* ¶ 43; *see also id.* ¶¶ 45, 69, 78–92.  "Although factual allegations of a complaint are normally accepted as true on a motion to dismiss, that principle does not apply to general allegations that are contradicted by more specific allegations in the Complaint."  *Salveson v. JP Morgan Chase & Co.*, 663 F. App'x 71, 75 (2d Cir. 2016) (summary order) (quoting *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151–52 (2d Cir. 2014)).  Reading the Complaint as a whole, it alleges that

---

1242 (S.D. Fla. 2013), *with McCabe v. Caribbean Cruise Line, Inc.*, 2014 WL 3014874, at *3 (E.D.N.Y. July 3, 2014), *and Hartley-Culp v. Green Tree Servicing, LLC*, 52 F. Supp. 3d 700, 703 (M.D. Pa. 2014).

Defendant hired third-party telemarketers to initiate calls on its behalf, but Defendant did not place those calls directly.[13]  *See* Dkt. No. 1 ¶¶ 43, 45.  Those telemarketers allegedly were "overseas" and were "anonymous."  *Id.* ¶ 45.  "Because Plaintiff has not adequately pleaded 'that [D]efendant actually, physically initiated the telephone calls at issue,' the Court concludes that Plaintiff has failed to state a TCPA claim under a theory of direct liability."  *Katz v. Caliber Home Loans, Inc.*, 2023 WL 5311488, at *3 (N.D. Tex. Aug. 17, 2023) (quoting *Aaronson*, 2019 WL 8953349, at *2).

Unable or unwilling to sue the overseas marketers, Plaintiff seeks to hold Defendant vicariously liable under § 227(c)(5) based on actual authority, Dkt. No. 1 ¶¶ 81–85, apparent authority, *id.* ¶¶ 86, 90, and ratification, *id.* ¶¶ 79, 92.  Defendant contests each of these theories, Dkt. No. 13-1 at 7–17, so the Court addresses them *seriatim*.  The Court concludes that Plaintiff does not currently allege sufficient facts to give rise to a plausible claim on any of the theories.

Plaintiff's well-pleaded allegations do not plausibly suggest that the telemarketers who contacted Plaintiff were agents of Defendant acting with actual authority.  "A principal is subject to liability to a third party harmed by an agent's [tortious] conduct when the agent's conduct is within the scope of the agent's actual authority."  Restatement (Third) of Agency § 7.04 (2006). Agency refers to the "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and *subject to the principal's control*, and the agent manifests assent to or otherwise consents so to act."  *Id.* § 1.01 (emphasis added).  Accordingly, "[t]he power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by

---

[13] That interpretation finds further support in Plaintiff's opposition to the motion to dismiss, as Plaintiff relies entirely on vicarious, rather than direct, liability. *See* Dkt. No. 16 at 6–8.

persons who are not agents."  *Hale v. Teledoc Health, Inc.*, 2021 WL 1163925, at *3 (S.D.N.Y.

Mar. 25, 2021) (quoting *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 278 (2d Cir. 2013)); *see*

*also Pers. v. Lyft, Inc.*, 542 F. Supp. 3d 1342, 1352 (N.D. Ga. 2021) ("Control is the fulcrum of

actual authority." (internal quotation marks omitted)).  In the absence of such power, the

relationship is best understood as an arms-length contractual relationship where the telemarketer

provides leads to the seller but does not act at his direction.

The complaint includes a conclusory assertion that "Defendant MKLLP maintained

interim control over the actions of their telemarketers."  Dkt. No. 1 ¶ 82; *see also id.* ¶ 84

(alleging "Defendant MKLLP had day-to-day control over the actions of its telemarketers").

"Even in a *pro se* case, however, 'although a court must accept as true all of the allegations

contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not suffice.'"

*Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (quoting *Harris v. Mills*, 572 F.3d 66, 72

(2d Cir. 2009)).  Consequently, Plaintiff's "[m]ere conclusory allegation[]" that Defendant "had

the right to control [the telemarketers], without more, fails to plead an agency relationship."

*Melito v. Am. Eagle Outfitters, Inc.*, 2015 WL 7736547, at *7 (S.D.N.Y. Nov. 30, 2015).

Plaintiff's non-conclusory allegations are similarly insufficient.  The Complaint avers

that Defendant "provid[ed] lead-qualifying instructions and lead volume limits" to the

telemarketers and "had absolute control over whether, and under what circumstances,

[Defendant] would accept a customer from their telemarketers."  Dkt. No. 1 ¶¶ 83, 85.  Yet the

mere fact that "an agreement imposes constraints on [a] service provider does not mean that the

service recipient has an interim right to give instructions to the provider.  Thus, setting standards

in an agreement for acceptable service quality does not of itself create a right of control."

Restatement (Third) of Agency § 1.01 cmt. f (2006); *see also CFPB v. Stratfs, LLC*, 2024 WL

911518, at *9 (W.D.N.Y. Mar. 4, 2024).  That Defendant allegedly placed restrictions on the

kind and number of leads it would accept from the telemarketers thus does not distinguish the

relationship between Defendant and the telemarketer from an arms-length contractual

relationship and does not constitute the kind of interim control necessary to establish an agency

relationship with actual authority.

Additionally, Plaintiff alleges that Defendant had "the ability to require [the

telemarketers] to respect the National Do Not Call Registry."  Dkt. No. 1 ¶ 84.  But in cases

involving "highly regulated industries" like telemarketing, courts have held that contractual

"requirements to comply with applicable laws, regulatory frameworks, or professionalism rules

alone are insufficient" to demonstrate control.  *Walfish v. Nw. Mut. Life Ins. Co.*, 2019 WL

1987013, at *6 (D.N.J. May 6, 2019); *see Ruggiero v. Am. United Life Ins. Co.*, 137 F. Supp. 3d

104, 113–14 (D. Mass. 2015).  It follows *a fortiori* that the assertion that Defendant *could* have

insisted on such a requirement is too paltry for the Court to find Defendant had interim control

over the telemarketers here.  As a result, Plaintiff's "non-conclusory allegations" of actual

authority fail to "'nudge' his claims . . . 'across the line from conceivable to plausible.'"

*Jackson*, 88 F. Supp. 3d at 138 (quoting *Twombly*, 550 U.S. at 555).

Nor does the complaint adequately allege that the telemarketers acted with apparent

authority.  "A principal is subject to vicarious liability for a tort committed by an agent in dealing

or communicating with a third party on or purportedly on behalf of the principal when actions

taken by the agent with apparent authority constitute the tort."  Restatement (Third) of Agency

§ 7.08 (2006).  "The torts to which [this principle] applies are those in which an agent appears to

deal or communicate on behalf of a principal and the agent's appearance of authority enables the

agent to commit a tort or conceal its commission." *Id.* cmt. a.  In those circumstances, "[a]pparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation made by the principal." *Id.* cmt. b.  Thus, "[a]pparent authority exists when a principal, either intentionally or by lack of ordinary care, induces [a third party] to believe that an individual has been authorized to act on its behalf." *Highland Cap. Mgmt. LP v. Schneider*, 607 F.3d 322, 328 (2d Cir. 2010) (alteration in original) (quoting *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir. 1997)).  But it is critical to a finding of apparent authority that the "written or spoken words or . . . conduct of the principal" create the impression that the agent is acting on behalf of the principal.  *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 69 (2d Cir. 2003) (quoting *Minskoff v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996)).  "Statements by an agent are insufficient to create apparent authority." *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 357 (7th Cir. 2020).

Plaintiff does not allege words or conduct of Defendant that would have led a reasonable third party to believe that the telemarketers were acting on Defendant's behalf, nor that the telemarketers' appearance of authority enabled them to commit or conceal the claimed TCPA violations.  Setting aside Plaintiff's conclusory allegations that Defendant "donned [its] telemarketers with apparent authority to make the calls at issue," Dkt. No. 1 ¶ 86; *see Chavis*, 618 F.3d at 170, the Complaint avers merely conduct by the telemarketers—namely, that they "live transferred" Plaintiff's call to Defendant, Dkt. No. 1 ¶ 53.  Plaintiff also asserts that "Defendant MKLLP's telemarketers transferred customer information, including Plaintiff's contact information, directly to Defendant MKLLP." *Id.* ¶ 90.  Without elaboration, the precise information the telemarketer transferred to Defendant is unclear.  Plaintiff's more specific

allegation that his call was transferred to Defendant indicates that the contact information the telemarketer sent to Defendant consisted of Plaintiff's phone number.  But Plaintiff alleges neither conduct or words by Defendant that could be understood as vesting the telemarketers with authority, nor how such authority contributed to the alleged TCPA violations.  It is in the nature of a third-party telemarketer that it will transfer the leads it receives to a party who can use them.  That does not mean that the telemarketer is acting on the authority of another, rather than on its own authority in the hope of making a sale.  *See Bank v. GoHealth, LLC*, 2021 WL 2323282, at *12 (E.D.N.Y. Mar. 8, 2021) ("[Plaintiff] has also not alleged that the [defendant's] employee with whom plaintiff eventually spoke and corresponded with, Jared, made any representations of a relationship or purpose underlying the initial Call or two subsequent transfers."), *report and recommendation adopted*, 2021 WL 1884671 (E.D.N.Y. May 11, 2021); *Winters v. Quicken Loans Inc.*, 2021 WL 5040323, at *4–5 (D. Ariz. Oct. 29, 2021); *see also McCurley v. Royal Seas Cruises, Inc.*, 2022 WL 1012471, at *2 (9th Cir. Apr. 5, 2022).  The telemarketer may itself be liable under the TCPA, but its transfer of the contact information to the seller does not make the seller liable under a theory of apparent authority.

Plaintiff's allegations thus are a far cry from those deemed sufficient to plead apparent authority in *Banks v. Pro Custom Solar*, 416 F. Supp. 3d 171.  There, the complaint stated that the plaintiff had received unwanted calls with prerecorded messages and "at the conclusion of the prerecorded messages, he was transferred to a live representative of Advanced Energy Solutions.  Advanced Energy Solutions stated that the Calls had been placed to 'promote the goods and services of [Defendant].'"  *Id.* at 174.  And when plaintiff later called the defendant, "a representative of Defendant confirmed that Advanced Energy Solutions was its operating service."  *Id.*  The court therefore concluded that defendant's statements "could reasonably give

the appearance" that Advanced Energy Solutions had placed the unwanted calls on defendant's behalf. *Id.*[14] By contrast, Plaintiff here alleges merely that Defendant accepted his live-transferred call. Dkt. No. 1 ¶ 53. The Complaint notably does not assert that Defendant ever indicated that the telemarketers were authorized to act on its behalf. *See Winters v. Grand Caribbean Cruises Inc.*, 2021 WL 3709854, at *6 n.3 (D. Ariz. Aug. 20, 2021) ("There is no allegation that the representative made any statements about the Telemarketing Agent's role or authority."). Accordingly, the Court determines that—unlike in *Banks*—Plaintiff's "allegations are not enough to create apparent authority." *Warciak*, 949 F.3d at 357.

Finally, the Complaint does not adequately plead that Defendant ratified the telemarketers' violations of the TCPA. The Restatement recognizes that "[a] principal is subject to liability to a third party harmed by an agent's [tortious] conduct when the agent's conduct is . . . ratified by the principal."[15] Restatement (Third) of Agency § 7.04 (2006). Ratification is "the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Id.* § 4.01(1); *see Kristensen v. Credit Payments Servs. Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018). "Ratification requires acceptance by the principal of the benefits of an agent's acts, with full knowledge of the facts, in circumstances indicating an intention to adopt the unauthorized [conduct]." *Bank v. Vivint Solar, Inc.*, 2019 WL 2280731, at *5 (E.D.N.Y. Feb. 25, 2019) (alteration in original) (quoting *Monarch Ins. Co. of Ohio v. Ins.*

---

[14] Indeed, *Banks* can be understood as an "actual authority" case, in which the defendant's statements constituted an evidentiary admission that the telemarketer was acting as defendant's agent.

[15] Historically, ratification applied "exclusively with respect to property-related torts." Anthony W. Kraus, *Ratification of Torts: An Overview and Critique of the Traditional Doctrine and Its Recent Extension to Claims of Workplace Harassment*, 32 Tort & Ins. L.J. 807, 810 (1997). But the doctrine "also came to be applied in cases of personal torts—especially in suits for physical and legal interference by an agent with customers or the public." *Id.* at 810–811; *see Agency – Master and Servant – Ratification of Tort*, 5 Harv. L. Rev. 243, 243 (1891).

*Corp. of Ir. Ltd.*, 835 F.2d 32, 36 (2d Cir. 1987)).  "Alternatively, a principal may ratify a third party's conduct through willful ignorance, or not knowing the material facts but 'ratif[ying] with awareness that such knowledge was lacking.'"  *Hale*, 2021 WL 1163925, at *5 (quoting *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073–74 (9th Cir. 2019)).  The Restatement offers as examples of vicarious liability created by ratification the case of an employer who agreed that a plant manager's assault of an employee fell within the scope of the plant manager's employment, and a case in which the senior management of a company adopted the harassing and abusive behavior of an employee towards his subordinate by observing that behavior without taking any action to repudiate it.  Restatement (Third) of Agency § 7.04 cmt. b (citing *Lee v. United States*, 171 F. Supp. 2d 566, 577 (M.D.N.C. 2001) and *LaBozzo v. Brooks Bros., Inc.*, 2002 WL 1275155 (N.Y. Sup. 2002)).  In addition, the Second Circuit held that clients were liable as principals for the fraudulent conduct of their lawyer-agent when the clients retained the lawyer as their attorney and, in doing so, expressly "ratif[ied] and approve[d] each and every one of the actions undertaken by [the attorney]."  *Chevron Corp. v. Donziger*, 833 F.3d 74, 150 (2d Cir. 2016).

In cases involving tortious conduct, "the ratification must relate to the wrong itself, and not merely to the contractor's authority to act in that capacity, and the employer's mere acceptance of the benefits naturally flowing from the proper performance of the contract, and the retention of the benefits with knowledge that the contractor committed an independent tort do not amount to ratification of the tort itself."  30 C.J.S. Employer—Employee § 269 (2024).  Additionally, because "ratification is a 'form of retroactive activity,'" *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 318 (S.D.N.Y. 2006) (quoting *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 850 F.Supp. 1199, 1213 (S.D.N.Y. 1994)), "where a

principal ratifies an agent's originally unauthorized tort, the ratification relates back to the time the tortious act occurred for purposes of the principal's liability for the tort," 2A C.J.S. Agency § 88 (2024).

The Court need go no further than to observe that Plaintiff's Complaint is bereft of any allegation from which one could reasonably infer that Defendant knew or should have known that the telemarketers were violating the TCPA and its implementing regulations.  The Complaint cannot be sustained based on Plaintiff's legal conclusions, couched as factual allegations, that Defendant "knowingly and actively attempted to accept business that originated through illegal telemarketing" and "knew (or reasonably should have known) that their telemarketers were violating the TCPA on their behalf."  Dkt. No. 1 ¶¶ 79–80; *see Read v. Corning Inc.*, 371 F. Supp. 3d 87, 92 (W.D.N.Y. 2019) ("[W]here a defendant's knowledge of some fact or circumstance is an element of a tort claim, a bare assertion that a defendant 'knew or should have known' of that fact or circumstance is insufficient to state a claim.").  Instead, the viability of Plaintiff's TCPA claims depends on his non-conclusory allegations—namely, that "Defendant knew or should have known that its conduct would violate the TCPA and its regulations *because* Defendant MKLLP operates in a highly regulated telephone solicitation industry."  Dkt. No. 1 ¶ 65 (emphasis added); *see also id.* ¶¶ 66–67 (same).  Yet one can know another has a duty without knowing whether that duty has been violated, so "the Court rejects [Plaintiff's theory] as inappropriately conflating the issues of duty and breach of duty."  *Ross v. Am. Red Cross*, 2012 WL 1656995, at *11 (S.D. Ohio May 10, 2012), *aff'd*, 567 F. App'x 296 (6th Cir. 2014).  Even if Defendant knew or should have known the contents of the FCC's telemarketing regulations, it does not follow that Defendant should have known that the telemarketers had violated those regulations when Defendant accepted the benefits of their

efforts. *See Hodgin*, 885 F.3d at 253. Likewise, Plaintiff's well-pleaded allegations support the inference that Defendant was aware the telemarketers had solicited individuals injured at Camp Lejeune. But "[t]he knowledge that an agent is engaged in an otherwise commonplace marketing activity is not the sort of red flag that would lead a reasonable person to investigate whether the agent was engaging in unlawful activities." *Kristensen*, 879 F.3d at 1015. Because the complaint fails to allege that Defendant had "'knowledge of facts that would have led a reasonable person to investigate further,' [Defendant] cannot be deemed to have ratified [the telemarketers' wrongful] actions and therefore is not vicariously liable." *Id.* (quoting Restatement (Third) of Agency § 4.06 cmt. d).

Plaintiff's failure to plead either direct or vicarious liability under 47 U.S.C. § 227(c)(5) is fatal to his TCPA claims. Accordingly, the Court grants Defendant's motion to dismiss Counts One and Two. But that dismissal is without prejudice to Plaintiff repleading his TCPA claims with allegations sufficient to support direct or vicarious liability under the standards described above.[16] *See Green v. Mauskopf*, 2022 WL 2305369, at *2 (E.D.N.Y. June 27, 2022) (observing "dismissal of a *pro se* plaintiff's claims for failure to state a claim is generally without prejudice and with leave to replead").

---

[16] Plaintiff's Complaint does not assert a claim pursuant to 47 U.S.C. § 227(b). *Cf.* Dkt. No. 1 ¶¶ 10–11. But, even if Plaintiff had, the Complaint would fail to state a claim under that provision because Plaintiff has "not provided any factual detail to support an inference that an automatic telephone dialing system, artificial or prerecorded voice was used." *Sterling v. Securus Techs., Inc.*, 2019 WL 3387043, at *7 (D. Conn. July 26, 2019); *see also Baranski v. NCO Fin. Sys., Inc.*, 2014 WL 1155304, at *6 (E.D.N.Y. Mar. 21, 2014) ("Plaintiffs need not plead specific technical details regarding [a defendant's] use of an ATDS, but they must at least describe, in laymen's terms, the facts about the calls or the circumstances surrounding the calls that make it plausible that they were made using an ATDS." (internal quotation marks omitted)).

## IV.     State Law Claims

The remaining counts of Plaintiff's complaint—Counts Three through Five—assert claims under Florida and Texas state law.  Plaintiff brings those claims pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).  *See* Dkt. No. 1 ¶¶ 5–6.  But a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  And "[i]t is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims."  *Klein & Co. Futures v. Bd. of Trade of City of N.Y.*, 464 F.3d 255, 262 (2d Cir. 2006).  Balancing "the traditional 'values of judicial economy, convenience, fairness, and comity,'" *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)), and considering the "early stage of [this] litigation, the Court declines to exercise supplemental jurisdiction over Plaintiff['s] state-law claims," *Bongiorno v. Baquet*, 2021 WL 4311169, at *22 (S.D.N.Y. Sept. 20, 2021).  Thus, the Court dismisses Counts Three through Five without prejudice.  *See DiResta v. Biz2Credit Inc.*, 2021 WL 6052104, at *6 (S.D.N.Y. Dec. 20, 2021).

## CONCLUSION

Defendant's motion to dismiss the complaint for failure to state a claim, Dkt. No. 13, is GRANTED.  The Court dismisses Plaintiff's complaint, Dkt. No. 1, without prejudice to repleading within sixty days, *see Turner v. Lincon-Vitale*, 2020 WL 7629920, at *3 (S.D.N.Y. Dec. 22, 2020).  If Plaintiff does not file an amended complaint within sixty days of this Opinion and Order, the Court will close the case.

The Clerk of Court is respectfully directed to close Dkt. No. 13.


SO ORDERED.


Dated: July 3, 2024
New York, New York                              _____
                                                                LEWIS J. LIMAN
                                                        United States District Judge